Filed 7/20/26  P. v. Rand CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B331692 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA446655) |
| v. | |
| DAVEON RAND, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge.  Affirmed in part and remanded with directions.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Eric J. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

Defendant Daveon Rand was convicted of three murders, five attempted murders, and four counts of being a felon in possession of a firearm, all relating to a series of shootings committed between 2014 to 2016.  The jury also found true, along with various firearm and gang-related enhancements, the special circumstance that Rand committed the murders to further the activities of a criminal street gang.  Rand appeals the convictions, raising multiple claims of error.  We agree with the parties that reversal of the gang special circumstance is required but otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

**A.  Prosecution Evidence**

1.  *Gangs and Firearm Evidence*

Rand was an active member of the Main Street Crips.  Los Angeles Police Department (LAPD) Detective Erik Shear testified as an expert regarding criminal street gangs in Los Angeles.  He was familiar with the Main Street Crips, also known as the Main Street Mafia Crips.  The gang's members congregated at 84th and Main Street and 98th and Main Street.

Detective Shear was also familiar with the Family Swan Bloods.  The Family Swan Bloods' territory bordered that of the Main Street Crips, and the gangs often clashed.  Gang members, including Main Street Crips, used the derogatory term "'Sway'" to refer to Family Swan Bloods.  Rival gang members frequently used Instagram and other social media platforms to threaten and show disrespect for each other.

---

[1]  Additional background facts relevant to Rand's claims on appeal are set forth below in the discussion for each claim of error.

Detective Shear reviewed photographs of tattoos worn by the Main Street Crips. One tattoo referring to the Family Swan Bloods read, "'If it flies, it dies.'" Detective Shear explained this meant, "If it's a Swan[,] it dies."

Detective Shear also testified as a firearms expert. He described a "7.62 by 39 cartridge" as the size of the cartridge in millimeters and explained that type of ammunition was commonly associated with "AK-47 variant rifles." Gang members referred to an AK-47 variant rifle as a "'Chopper'" or "'Choppa.'" Detective Shear reviewed photo and video evidence of Rand holding an AK-47 variant rifle. The detective confirmed the rifle fired 7.62 caliber cartridges. There was also video showing Rand firing an AK-47 rifle at a shooting range with boxes of 7.62 caliber cartridges.

2. *Rand's Girlfriend Confirmed He was a Main Street Crips Member*

In 2012, when Tasheonna Dailey became Rand's girlfriend, she knew he was a member of the Main Street Crips. Dailey was familiar with the Family Swan Bloods and knew them to be a rival of the Main Street Crips. She knew the term "'Sway'" was a derogatory reference to the Family Swan Bloods. She had heard Rand use the term. She also recorded a video in June or July 2015 of Rand singing about killing "Sways." She said Rand was taking pain medication at the time.

Dailey knew Rand had gang tattoos, including a tattoo on his arm reading, "'If it flies, it dies.'" She knew Rand's nickname was "JM," which stood for Junior Mafia. She also knew Barry Gardner, who went by "Little JM" and was close with Rand.

3

Between 2014 to 2016, Dailey saw Rand with multiple assault weapons.

In 2013, Dailey and Rand lived together at a residence on 84th Street. In 2015, they moved to an apartment in Hawthorne on Kornblum Avenue. Rand and Dailey worked at oil refineries for a company called Total Safety. The refinery where they worked the most was located at 190th Street and Crenshaw. Rand worked there from approximately late 2012 or early 2013 to 2016.

3. *June 15, 2014, Attempted Murder, Marasho Mazique (Count 8) at Three Star Liquor*

On June 15, 2014, Dailey was at church when she received a call from Rand telling her his car was on fire. She rushed home and found the car smoking and wet. Inside the car, she saw a burnt soda bottle that looked like it could have been used as a Molotov cocktail. Dailey called the police.

At approximately 1:30 p.m., a police officer responded to the call. The officer looked at the car and saw the burned interior. He observed a bottle partially filled with gasoline and a hammer inside the vehicle.

Later that evening, Marasho Mazique, a Family Swan Bloods member, went to Three Star Liquor on 81st Street and Avalon Boulevard. The liquor store was a hangout for Family Swan Bloods. Mazique was walking out of the store when he was shot eight times.

A detective responded to a 911 call about the shooting and found Mazique inside the store. Paramedics transported Mazique to the hospital. Officers recovered 11 .45 caliber casings and five .45 caliber slugs. An officer reviewed surveillance

4

footage of the shooting at the liquor store. The shooter was wearing all black, white gloves, and a Philadelphia Eagles hat.

4. *December 26, 2014, Attempted Murder, Randy Walker (Count 9)*

In December 2014, Dailey ran into a member of the Family Swan Bloods, Randy Walker, at the Compton Swap Meet. Walker tried to "hit on" Dailey and asked for her phone number. Dailey told him, "'No.'" She did not recall whether she told Rand about the incident, but she said that if somebody from the Family Swan Bloods hit on her, that was generally something she would tell him

On December 26, 2014, Walker was shot at while he was driving in the area of 84th and Wall Streets. Walker crashed but was able to drive away. A five-year-old child playing in his front yard saw a man running after a truck, shooting at it with a handgun. The child did not see the shooter's face.

5. *June 25, 2015, Attempted Murder, Randy Walker (Count 10)*

On June 25, 2015, Walker was sitting in the driver's seat of his car with his cousin, eating in front of a taco shop on San Pedro Street, when his car was hit by bullets. A bullet grazed Walker's back before he drove away. A police officer responded to the shooting and found 11 expended .45 caliber casings in front of the taco shop.

The following day, Walker went to a police station to report the shooting. An officer inspected the vehicle and saw the driver's side door had been damaged by gunfire. The officer found four .45 caliber projectiles in the driver's area of the car.

6. *August 18, 2015, Murder, Tony Jones (Count 1)*

On August 18, 2015, LAPD Detectives Samuel Marullo and Iris Romero were assigned to investigate the murder of Tony Jones, which had occurred that day. The detectives responded to the area of 145 West 79th Street where Jones was shot and killed. The police recovered 24 7.62 by 39 discharged cartridge cases and 10 10-millimeter discharged cartridge cases.

While investigating the Jones murder, Detective Marullo was alerted to the Instagram accounts of "Coool_JM" and "Hoochie_Killa_Sway." Investigation revealed the accounts appeared to be active on the same device. Coool_JM, as confirmed by Dailey and the information posted on the account (e.g., name, phone number, photos), belonged to Rand, whose nickname was "JM." Hoochie_Killa_Sway, however, did not have any readily apparent information identifying who owned the account. According to Detective Marullo, the name Hoochie_Killa_Sway meant "Hoover"[2] killer and "Swan" killer.

The Hoochie_Killa_Sway account posted a photo of Randy Walker with the text, "And then KT got dropped." "KT" was Tony Jones's nickname, and "dropped" meant shot. There were additional posts on the account showing disrespect for Family Swan Bloods, threatening to shoot them with a rifle, and bragging about eliminating Jones as a rival. Shortly after Jones was killed, a picture of Jones crossed-out with an X was posted along with the text, "Main Street Choppa victim. . . On Mafia ktK did a cartwheel when he got hit with that chop." (*Sic.*) Another post threatened to shoot Walker with a "choppa."

---

[2] The Hoover Criminal Gang was another rival gang of the Main Street Crips.

Detective Romero also looked at an Instagram account that displayed photos of gang graffiti. The account's posts had comment sections open for anybody to post messages. Eight days after the Jones murder, Hoochie_Killa_Sway wrote to another user, "[O]n M's every time I push through y'all set I get ma man. Rather he die or not. Got KT tho. that boy face was gone." (*Sic.*) Detective Marullo explained that this meant Hoochie_Killa_Sway said he shot Jones in the face. Jones did in fact sustain significant damage to his face and head when he was shot. There were additional posts with details consistent with the murder, including that Jones was also shot in the legs with a rifle and the location of the shooting.

Other posts from the Hoochie_Killa_Sway account indicated the arson incident involving Rand's car on June 15, 2014, was the motive behind the shooting of Mazique that night at Three Star Liquor. The posts also contained information consistent with the shooting. Additional posts threatened that killings would continue and a rifle would be used.

Dr. Kenny Su performed the autopsy of Jones and prepared a report. The report indicated Jones suffered seven gunshot wounds. It listed the cause of death as multiple gunshot wounds and manner of death as homicide.

7. *September 20, 2015, Attempted Murder, Randy Walker (Count 11)*

On September 20, 2015, Walker was targeted for a third time. He was leaving a house on 80th Street with his cousin when somebody got out of a car and started shooting at them. When they heard the shots, Walker and his cousin hid in a backyard.

W. Cardenas was barbecuing in his front yard when a white car stopped in front of him. Cardenas saw someone get out of the back driver's side door and heard gunshots. When the shooting finished, Cardenas heard the door close and the car take off.

LAPD Officers Edward Avila and Jonathan Gundell responded to the shooting. Cardenas told the officers the gun used seemed like a "strong weapon, like a rifle" because "the gunshots were quite loud." The officers located 26 expended 7.62 caliber casings, two live 7.62 rounds, and 14 expended .40 caliber casings. Officer Avila found Walker and his cousin in a backyard. Officer Avila also spoke with another person who provided a video of the shooting.

8.     *January 23, 2016, Murders of Shujaa Silver (Count 3) and Cyjai Bell (Count 4), and Attempted Murders of Alex Taylor (Count 5) and Thomas Hall (Count 6)*

a.     *The Jeep Patriot Rental*

Mykila Wright was in a relationship with Gardner (Rand's close friend who was known as Little JM). Wright rented a gray Jeep Patriot from Enterprise Rent-A-Car from January 14 to January 26, 2016. Wright shared the Jeep with Gardner. He used the vehicle to drop her off at work on January 23, 2016, and she did not see him again until early the next morning.

b.     *The Second Three Star Liquor Shooting*

On January 23, 2016, Thomas Hall, Shujaa Silver, Cyjai Bell, and Alex Taylor were hanging out at about 8:00 p.m. at Three Star Liquor, the same store where Family Swan Bloods

8

member, Mazique, had been shot after Rand's car was set on fire in June 2014. Hall and Silver were members of the Family Swan Bloods, and Bell was affiliated with the gang. They were outside the store when shots were fired at them. Hall got shot in the back and hip and ran inside the liquor store. Taylor suffered a graze wound to the head. After the shooting, Hall went outside and saw Silver and Bell laying on the ground. Silver and Bell had been shot and died.

LAPD Detective Matthew Casalicchio was assigned to investigate the murders. Numerous expended 7.62 by 39 caliber cartridges were recovered at the scene. Detective Casalicchio reviewed surveillance recordings from the liquor store and neighborhood that captured the shooting. He was able to determine the suspect vehicle's path of travel before and after the shooting using the recordings. The recordings also captured the shooter exiting the suspect vehicle, shooting Hall, Silver, Bell, and Taylor, and fleeing in the same waiting vehicle. From the recordings, Detective Casalicchio identified the suspect vehicle as a gray or charcoal Jeep Patriot. After Gardner was later arrested in a different vehicle rented by Wright, Detective Casalicchio traced the suspect Jeep Patriot back to Wright's rental from Enterprise Rent-A-Car.

Detective Casalicchio found Instagram posts on the Hoochie_Killa_Sway account relating to the second Three Star Liquor shooting. The posts claimed credit for the shooting, explained the shooter got out of the vehicle and used a rifle, and provided details about the victims and how they were shot. The posts also referenced other shootings: they stated Hoochie_Killa_Sway "stood over" Jones with a rifle and shot Mazique at the same liquor store.

In response to a post from Walker's Instagram account stating that "choppa boy" was "'in hiding,'" Hoochie_Killa_Sway replied, "Ha. . . I'm in yo hood chopping sh*t up ! Choppa Boy strucc once again." (*Sic.*) Detective Marullo explained that this meant Hoochie_Killa_Sway, or "Choppa Boy," was shooting up Walker's neighborhood and was successful in a shooting. This post was made after the double murder at Three Star Liquor, which was in the Family Swan Bloods' neighborhood.

### c.  *Autopsies of Silver and Bell*

Dr. Matthew Miller performed the autopsy on Silver and prepared a report. Dr. Miller determined Silver suffered eight gunshot wounds. Dr. Miller concluded the wounds were "compatible with a high velocity round, something like a rifle," and were consistent with a 7.62 caliber bullet.

Dr. David Whiteman performed the autopsy of Bell and prepared a report. The report concluded the cause of death was a gunshot wound and manner of death was homicide.

### 9.  *Arrest of Rand and Investigation*

Detective Casalicchio's investigation led to him focus on Rand as the suspect for the murders. Rand was arrested in May 2016. On the morning of his arrest, a group text message warned Rand there was a "raid team" in his neighborhood. Detective Casalicchio was monitoring the Hoochie_Killa_Sway account that morning and noticed that all posts and photos, except for one of Walker crying, were being deleted.

The police recovered a cellphone from Rand after his arrest. After Rand shared the code to unlock his cellphone with his mother during a phone call he made while in custody, Detective

10

Casalicchio was able to access Rand's cellphone and extract information from it. Detective Casalicchio concluded the Coool_JM and Hoochie_Killa_Sway accounts were accessed through Rand's phone and that they were created on his phone. After receiving responses to search warrants for the Coool_JM and Hoochie_Killa_Sway accounts, Detective Casalicchio found the accounts used the same IP addresses on numerous dates. Further, Detective Casalicchio found that photos deleted from Rand's cellphone appeared on the Hoochie_Killa_Sway account.

The police also discovered a Facebook conversation between Rand and another person where Rand said he was going to "'tag'" the person on his "'fake [Instagram].'" Shortly after, the Hoochie_Killa_Sway account tagged the Instagram account of the person with whom Rand was conversing. Following Rand's arrest, Detective Casalicchio continued to monitor the Hoochie_Killa_Sway account; there were no logins after the arrest. The detective concluded the account belonged to Rand.

Detective Marullo discovered that on June 27, 2015, two days after shots were fired at Walker in front of the taco shop, Hoochie_Killa_Sway messaged Walker's Instagram account. The message read: "God was on yo side huh lol . . . crazy cause a n*gga hit yo' side of the car up . . . Its cool. Every chance I get I'm gon try to drop yo ass. U ain't got too many chance big dawg. Next time I'm clappin' that ass on Main St." (*Sic.*)

Additionally, the police saw that five days before Jones's murder in August 2015, Rand texted Dailey asking her to purchase ammunition, including "'7.62 by 39 ammo for an AK.'" This was the same size as the cartridge cases recovered from the scene of Jones's murder. Approximately a week after Jones's

11

murder, Hoochie_Killa_Sway posted a message responding to another post stating, "Lol n*gga for one this is a fake page for police purposes, not finna incriminate maself none . . ." (*Sic.*)

Detective Casalicchio also checked the Coool_JM account's posts and messages. On December 21, 2015, the Coool_JM account posted, "A SwayK has to drop bk4 Christmas." (*Sic.*)

A text string with Coool_JM showed that on January 22, 2016, Rand messaged, "Wussup with these swaysK," before later messaging, "I got this [motherf*ckin'] choppa & on Main street where this n*gga Lil j at." (*Sic.*) Detective Casalicchio determined "'Lil j'" was Gardner.

At 5:43 p.m., on January 23, 2016, the day the second Three Star Liquor shooting took place, there was a message, "'Ready?'" At 5:45 p.m., another person messaged, "'I get off round 7.'" (*Sic.*) At 5:46 p.m., Rand messaged, "'Lil finna grab me in a few then OMSK[3] to the set.'" At 7:21 p.m., Rand sent a message asking where another person was. Later at 10:17 p.m., after the second Three Star Liquor shooting, someone messaged, "'God damn cuz.'" (*Sic.*)

Additionally, Detective Casalicchio obtained videos of Rand firing an assault weapon at different firing ranges. The detective determined one of videos showed Rand firing a weapon of the type used in the double murder of Silver and Bell, which fired the same 7.62 caliber cartridges found at the crime scene. The video was recorded in March 2016 at a shooting range in Georgia. A receipt showed Rand purchased ammunition, targets, and ear plugs. The receipt did not show that a firearm was rented.

---

3       "OMSK" meant "on my way" or "'on my Sway.'"

Detective Casalicchio reviewed Rand's employment records and determined he was not working the day Mazique was shot at Three Star Liquor (June 15, 2014), the day Walker was shot at while driving in the area of 84th and Wall Streets (December 26, 2014), the day Jones was murdered (August 18, 2015), or the day shots were fired at Walker and his cousin on 80th Street (September 20, 2015). Employment records showed Rand worked on the day shots were fired at Walker in front of the taco shop (June 25, 2015) and on the day of the double murders of Silver and Bell (January 23, 2016), but cellphone records placed him in the area of both shootings at the time they occurred.

Using Rand's Gmail account, the police were able to analyze Rand's Google location history based on cell tower and Wi-Fi access points.[4] The data placed Rand's cellphone in the area of the June 25, 2015, shooting targeting Walker in front of the taco shop; the Jones murder at 145 West 79th Street on August 18, 2015; and the Walker shooting on 80th Street on September 20, 2015. For January 23, 2016, the data showed Rand's cellphone traveling to Three Star Liquor from his Kornblum residence and being in the vicinity when the shooting occurred.

Cellphone records also showed a telephone call between Rand and Gardner an hour and a half before the January 2016 Three Star Liquor shooting. Google location history placed Rand's cellphone at or near his Kornblum Avenue address at approximately 6:30 p.m. Cell site activity for Gardner's cellphone was consistent with someone traveling to the Kornblum address

---

[4]    The police were unable to obtain any Google location history data for 2014.

and arriving in the same area as Rand's cellphone at approximately 6:47 p.m. The cell site data was also consistent with someone traveling to the area of the shooting at the time it occurred.

The location history data was also provided for social media posts by Hoochie_Killa_Sway. A few weeks after the January 2016 Three Star Liquor shooting, Hoochie_Killa_Sway bragged about the murders of Silver, Bell, and Jones and attempted murder of Mazique. Location history data placed the cellphone that made the posts at the oil refinery where Rand worked. The data for posts referring to other shootings and related threats was also consistent with locations associated with Rand, such as the refinery and his residence on Kornblum Avenue. The data also linked the Hoochie_Killa_Sway account to the Coool_JM account and Rand's email, phone number, and Facebook.

Additionally, the police searched Rand's residence after he was arrested and located a Philadelphia Eagles hat that was like the hat the suspect was wearing at the time of the Mazique shooting. The police also located video evidence on Dailey's phone showing Rand was in possession of an assault weapon two months before the January 2016 murders.

## B.    Defense Evidence
### 1.    *Other Individuals Used Rand's Phone*

Dailey and Rand lived together from 2012 or 2013 until Rand was arrested in May 2016. When they lived together at the Kornblum address, Dailey saw other Main Street Crips using Rand's phone. One such person was her cousin, Jermaine Murray. Murray would stay with them for weeks to months. She

14

never saw Murray with his own cellphone. Murray was killed two days after the January 2016 liquor store shooting. Dailey continued seeing other Main Street Crips using Rand's phone after Murray's death.

Johnny Johnson, a member of the Main Street Crips, used Rand's phone between 2014 to 2016 to access the internet and Instagram. Johnson said he would use Rand's phone to access the Hoochie_Killa_Sway account to taunt rival gangs and post comments and photographs. Johnson also accessed the Coool_JM account and posted things about the Family Swan Bloods. Kevin Leslie said he also used Rand's phone to login to Instagram and access the Hoochie_Killa_Sway account. Andrew Butler was associated with the Main Street Crips and said he used Rand's phone between 2014 and 2016. Johnson, Leslie, and Butler said they each saw other members of the Main Street Crips using Rand's phone between 2014 to 2016.

Dailey looked at a photograph and identified multiple people in the picture as being members of the Main Street Crips who worked at the oil refinery with Rand. Dailey knew several Main Street Crips worked at the refinery because they were all hired at a job fair by the same supervisor who was associated with the Main Street Crips. The supervisor associated with the gang said the refinery had a zero-cellphone policy and phones were not allowed inside operating areas. However, at times employees did not comply with the policy, and on one occasion, the supervisor warned Rand about using his phone.

2. *Rand's Foot Injury*

In July 2015, Rand was shot in the foot and could not walk. After Dailey picked him up from the hospital, he used crutches

15

and wore a boot. That month, Rand worked three days at the refinery. Rand's employment was terminated in late July 2015, because he could not walk. Dailey said it was not until sometime in September 2015 that she saw Rand walking around "the way he used to before he got shot." After terminating Rand's employment in July 2015, the supervisor associated with the Main Street Crips rehired Rand in October 2015 when Rand was able to walk.

## C.    The Charges

Rand was charged in a 14-count information with the following crimes: the murder of Jones on August 18, 2015 (count 1); possession of a firearm by a felon on August 18, 2015 (count 2); the murders of Silver (count 3) and Bell (count 4), and attempted murders of Taylor (count 5) and Hall (count 6) on January 23, 2016; possession of a firearm by a felon on January 23, 2016 (count 7); the attempted murder of Mazique on June 15, 2014 (count 8); the attempted murders of Walker on December 26, 2014 (count 9), June 25, 2015 (count 10), and September 20, 2015 (count 11); and possession of a firearm by a felon on December 26, 2014 (count 12), June 25, 2015 (count 13), and September 20, 2015 (count 14).

As to all counts, it was alleged the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang pursuant to Penal Code[5] section 186.22. As to the murder and attempted murder counts, it was further alleged that Rand personally used and intentionally discharged a firearm causing great bodily injury or death within the meaning

_____

[5]    All further statutory references are to the Penal Code, unless otherwise stated.

16

of section 12022.53.  As to the murder counts, the information alleged a special circumstance under section 190.2, subdivision (a)(3), and a criminal street gang special circumstance under section 190.2, subdivision (a)(22).

## D.    The Verdicts and Sentencing

In 2021, a jury convicted Rand of counts 1 through 8, 10 through 11, and 13 through 14.  The jury found the murders to all be in the first degree.  The jury found true the related special allegations as to all counts Rand was convicted of, with the exception of the firearm allegations under section 12022.53 as to counts 3 through 6 and 8.  The jury did not reach a verdict as to the firearm allegations in those counts.  The jury found Rand not guilty of counts 9 and 12.

At sentencing, the special gang allegations under section 186.22 were dismissed in light of Assembly Bill No. 333 (Assembly Bill 333) (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, § 1).  Rand's total sentence was three terms of life without the possibility of parole for the murders plus 60 years to life and 40 years for the remaining counts and enhancements.  Rand timely appealed.

## DISCUSSION
## A.    The Trial Court Did Not Err in Denying Rand's *Batson/Wheeler* Motion

During voir dire, defense counsel brought a motion under *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Batson/Wheeler*), objecting to the prosecution's peremptory challenge to a Black female juror.  The trial court denied Rand's motion, finding he did not make a prima

17

facie showing that the prosecutor exercised the peremptory challenge in a discriminatory manner.  We find no error.

### 1.    *Additional Background*

Juror No. 5632 was a single, Black woman from Los Angeles who worked as a chemist and previously sat on a jury that reached a verdict.  When asked by the prosecutor, she mentioned a negative experience with law enforcement that occurred about five years earlier.  She said she was pulled over in a different jurisdiction for "almost making an illegal U-turn," was handcuffed, and her car was searched.  Juror No. 5632 believed the incident was "inappropriate" but would not hold it against any police officers testifying.  She said she could be fair to both sides.  Previously, Juror No. 5632 had raised financial concerns about serving on the jury with the judge.[6]  When the prosecutor noted this, Juror No. 5632 stated it would not be a pressing issue.  Defense counsel asked the prospective jurors if they ever had personally been the victim of a crime, and Juror No. 5632 said she had.

The prosecutor exercised a peremptory challenge against Juror No. 5632, and defense counsel brought a *Batson/Wheeler* motion challenging the excusal.  Defense counsel argued the juror was neutral and "the only qualifying characteristic that [counsel] would note about her was that she was indeed African-American."  The trial court did not think that, based on the prosecution's "single challenge," there was a sufficient basis to find the juror was excused "because she's from a cognizable

---

[6]    After ruling on the motion, the trial court later recalled that Juror No. 5632 said she would still work a 12-hour schedule, from 6:00 p.m. to 6:00 a.m., if she was on the jury.

18

class." The court found the defense did not make a prima facie showing under *Batson-Wheeler*.

The trial court then invited the prosecutor to give the reason why the juror was excused. The prosecutor explained that the parties had been in jury selection for eight days and had screened 100 to 200 prospective jurors. The prosecutor said that prior to exercising the peremptory against Juror No. 5632, the prosecution exercised 19 peremptory challenges, none of which "included African-Americans." The prosecutor added that there were currently two Black women on the jury who had been accepted by the prosecution and that all the victims in the case were Black.

The prosecutor said the juror came to the prosecution's attention because she claimed financial hardship and at the time "appeared dissatisfied with the court's ruling and generally unhappy to have to serve." Next, the prosecutor said the juror had a tattoo on the back of her ear and he generally "stay[ed] away" from jurors with face or neck tattoos. The prosecutor further asserted the juror had bad experiences with law enforcement and many police officers were going to be testifying. The prosecutor believed the juror would be biased and inattentive. Defense counsel argued that under Assembly Bill 3070, which counsel acknowledged had "not yet come into law," the prosecution's reasons did not provide a sufficient basis for exercising a peremptory challenge. The trial court reiterated it did not find the defense met its burden to make a prima facie case and denied the *Batson*/*Wheeler* motion.

19

2. *Legal Standard*

A *Batson/Wheeler* motion is evaluated under a three-step framework: "First, the defendant must make a prima facie case by showing facts sufficient to support an inference of discriminatory purpose. [Citation.] Second, if the defendant makes a prima facie showing, the burden shifts to the prosecutor to offer a permissible, nondiscriminatory explanation for the strike. [Citation.] Third, if the prosecutor offers a nondiscriminatory explanation, the trial court must decide whether that explanation is genuine, or whether impermissible discrimination in fact motivated the strike." (*People v. Battle* (2021) 11 Cal.5th 749, 772 (*Battle*).)

"[A]n appellate court properly reviews the first-stage ruling if the trial court has determined that no prima facie case of discrimination exists, then allows or invites the prosecutor to state reasons for excusing the juror, but refrains from ruling on the validity of those reasons." (*People v. Scott* (2015) 61 Cal.4th 363, 386.) Because this is what occurred here, we review the trial court's first-stage ruling that Rand did not make a prima facie case. "We consider whether "'the totality of the relevant facts'" surrounding [the juror's] excusal "'gives rise to an inference of discriminatory purpose.'"" (*Battle*, *supra*, 11 Cal.5th at p. 773.) The ultimate issue is whether a particular prospective juror has been challenged because of group bias, and "[w]e examine the entire record before the trial court to determine whether it supports an inference of such group bias." (*Ibid.*)

"Certain types of evidence are especially relevant to this inquiry, including whether the prosecutor has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against

20

members of that group, whether the party has engaged prospective jurors of that group in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group in which the majority of the remaining jurors belong. [Citation.] We may also consider nondiscriminatory reasons for the challenged strikes that are 'apparent from and "clearly established" in the record.'" (*Battle*, *supra*, 11 Cal.5th at p. 773.)

We review a denial at the first stage deferentially, considering only whether substantial evidence supports the trial court's conclusion. (*People v. Silas* (2021) 68 Cal.App.5th 1057, 1095 (*Silas*); *Battle*, *supra*, 11 Cal.5th at p. 772.)

3.      *Analysis*

We conclude the trial court's first-stage *Batson/Wheeler* ruling is supported by substantial evidence. "'[M]ak[ing] a prima facie case after the excusal of only one or two members of a group is very difficult.'" (*Battle*, *supra*, 11 Cal.5th at p. 776; *People v. Clark* (2016) 63 Cal.4th 522, 567 [same].) Before using the peremptory to excuse Juror No. 5632, the prosecutor used 19 peremptory challenges, none of which were against Black prospective jurors. There was no showing the prosecution struck most or all the members of the identified group or used a disproportionate number of peremptory challenges against the group. Moreover, the prosecutor accepted the panel with two Black women seated at the time it excused Juror No. 5632, which "further lessens any inference of discrimination." (*Battle*, *supra*, 11 Cal.5th at p. 777; see *People v. Lenix* (2008) 44 Cal.4th 602, 629 [prosecution's acceptance of panel containing Black juror

21

"strongly suggests" race was not a motive in challenge of other Black juror].)

Other factors also indicate the *Batson*/*Wheeler* ruling is supported by substantial evidence. There is no showing the prosecution singled out Black jurors or treated them differently. The prosecutor did not engage in "desultory" or cursory questioning of Juror No. 5632. (*Battle*, *supra*, 11 Cal.5th at p. 773.) This case does not involve racial identities that raise a heightened concern that the prosecutor's challenge was racially motivated. (See e.g., *id.* at p. 774 [Black defendant, White victims, and all White jury]; *People v. Miles* (2020) 9 Cal.5th 513, 523, 531 [excusal of Black jurors in case involving Black defendant accused of murdering White woman].)

Rand's arguments do not show the prosecutor had improper motives for excusing Juror No. 5632. He argues that there was no basis to conclude the juror would be biased and that she was an intelligent person. "But just because the record reveals that [Juror No. 5632] had much to commend her," does not raise an inference the juror was excused because of group bias. (*Battle*, *supra*, 11 Cal.5th at p. 779.) "So long as prosecutors are not motivated by discriminatory intent, they can strike prospective jurors for any reason—including for reasons that don't necessarily justify a challenge for cause." (*Ibid.*) Similarly, to the extent Rand suggests the prosecution should have liked the fact that the juror was a crime victim, the prosecutor does not "have to accept a prospective juror simply because the juror may be pro-prosecution in some respects." (*Ibid.*)

"Because the trial court rejected the *Batson*/*Wheeler* motion at step one, the prosecutor wasn't obligated to state his reasons for challenging *any* prospective juror." (*Battle*, *supra*, 11

22

Cal.5th at p. 784.) At the first stage, we "consider only whether the prosecutor's stated rationale was facially insincere." (*Id.* at pp. 784–785.) In this case, the prosecutor stated the juror was unhappy to serve after the court declined to excuse her due to financial hardship. She had a neck tattoo that made him question her judgment and a bad previous experience with law enforcement. With regard to the last stated reason, courts have "repeatedly held a negative experience with law enforcement is a race-neutral reason for excusal." (*People v. Bryant* (2019) 40 Cal.App.5th 525, 538.) Rand does not show any of the stated reasons were sufficient to raise an inference of bias under the applicable law at the time of trial. On their face, the prosecutor's reasons are not insincere.

In arguing otherwise, Rand relies heavily on Code of Civil Procedure section 231.7, enacted by Assembly Bill 3070, which lists 13 presumptively invalid reasons for exercising a peremptory challenge. (Code Civ. Proc., § 231.7, subd. (e).) Subdivision (i) of Code of Civil Procedure section 231.7 states, "This section applies in all jury trials in which jury selection begins on or after January 1, 2022." This date was after Rand's trial, and thus the statute does not apply. (See *Battle*, *supra*, 11 Cal.5th at p. 776, fn. 9 ["Assembly Bill No. 3070 has not yet taken effect . . . , so it offers us no occasion to revisit . . . our *Batson*/*Wheeler* jurisprudence more broadly"]; *Silas*, *supra*, 68 Cal.App.5th at p. 1069, fn. 12 & 1102 ["the legislation has no bearing on this appeal, however, because it applies prospectively to trials 'in which jury selection begins on or after January 1, 2022'"].)

Citing *People v. Hicks* (2024) 103 Cal.App.5th 1229, Rand argues Code of Civil Procedure section 231.7 should nonetheless

inform our analysis. *Hicks* is distinguishable as it addressed only the third stage of the *Batson/Wheeler* inquiry. Here, as substantial evidence supported the trial court's first-stage *Batson/Wheeler* ruling, it did not need to engage in a stage three analysis.

In sum, Rand fails to establish a basis for inferring that the prosecution may have struck Juror No. 5632 because of her race.

## B.     Any Confrontation Clause Error Concerning the Autopsy Reports was Harmless

Rand argues the trial court violated his constitutional right to confront and cross-examine witnesses and to due process when a coroner, Dr. Miller, was permitted to testify about the autopsies other medical examiners performed. Rand contends his rights were also violated when the autopsy reports of the non-testifying coroners were admitted into evidence. The People agree it was error for the trial court to admit the reports not prepared by Dr. Miller and to permit the coroner to testify about their contents. The People contend, however, that the error was harmless beyond a reasonable doubt. We agree with the People.

### 1.     *Additional Background*

During trial, defense counsel objected to Dr. Miller testifying about the Bell and Jones autopsies, which were performed by Dr. Whiteman and Dr. Su, respectively. Dr. Whiteman had a stroke and retired, while Dr. Su had taken a job in Sacramento. The prosecutor informed the trial court that Dr. Miller was the coroner "who is available."

Defense counsel objected to Dr. Miller testifying based on "*Sanchez*, hearsay, and *Crawford*," but the trial court allowed the

24

prosecution to present the evidence. Dr. Miller testified about photographs in Dr. Whiteman's report. He opined the photographs showed an entry wound from a gunshot to Bell's right shoulder and exit wound on her left mid- to upper back. Dr. Miller noted the photos showed Bell was shot once. Dr. Whiteman's report concluded the cause of death was a gunshot wound and manner of death was homicide.

Next, Dr. Miller testified as to the contents of the Jones autopsy report prepared by Dr. Su and photographs in the report. Dr. Miller stated there was a photograph showing multiple gunshot wounds to Jones's body. In particular, Dr. Miller noted a "large defect" and an exit wound from a gunshot in Jones's head, which Dr. Miller stated was compatible with an exit wound from a "high velocity bullet," such as a 7.62 caliber cartridge. Dr. Miller located other gunshot wounds to Jones's right shoulder, left side of the chest, neck, back, and left arm. Dr. Su's report concluded the cause of death was multiple gunshot wounds and manner of death was homicide.

2.  *Analysis*

Dr. Miller's testimony regarding the Bell and Jones autopsies can be grouped into two categories: (1) in-court statements premised explicitly on photographs, and (2) recitations of statements made by Dr. Whiteman and Dr. Su in the autopsy reports they created.

In *Crawford v. Washington* (2004) 541 U.S. 36, 53–54 (*Crawford*), the United States Supreme Court held that the admission of "'testimonial' hearsay" against a criminal defendant violates the defendant's confrontation rights unless the declarant is unavailable and the defendant had a prior opportunity for

25

cross-examination. (*People v. Nadey* (2024) 16 Cal.5th 102, 162 (*Nadey*).) "'Whether a challenged statement is hearsay is always the threshold question' in analysis of a *Crawford* claim." (*Ibid.*) "Hearsay is defined as 'a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.'" (*Ibid.*) "Documents such as letters or reports are very often hearsay because they are prepared out of court and generally offered to prove the truth of their contents." (*Ibid.*)

Photographs are different. (*Nadey*, *supra*, 16 Cal.5th at p. 162.) "A 'statement' for hearsay purposes is defined as the 'oral or written verbal expression or . . . nonverbal conduct *of a person.*'" (*Ibid.*) "Accordingly, '[i]t is clear that the admission of autopsy *photographs*, and competent testimony based on such photographs, does not violate the confrontation clause.'" (*Id.* at p. 163.) A significant part of Dr. Miller's testimony was based on autopsy photographs of Bell and Jones. He explained what the photographs depicted and used them to discuss Bell's and Jones's gunshot wounds. The photographs were not hearsay, nor was Dr. Miller's testimony based on his examination of them.

However, the portions of Dr. Miller's testimony relating what Dr. Whiteman and Dr. Su wrote in their reports were different. (*Nadey*, *supra*, 16 Cal.5th at p. 163.) "A 'hearsay problem arises when an expert simply recites portions of a report prepared by someone else, or when such a report is itself admitted into evidence. In that case, out-of-court statements in the report are being offered for their truth.'" (*Ibid.*) Dr. Miller's testimony about the contents of the autopsy reports included Dr. Whiteman's and Dr. Su's conclusions as to cause of death. To the extent Dr. Miller was "simply relaying the contents of the

26

reports to the jury, his testimony constituted hearsay." (*Id.* at pp. 163–164.)

Assuming the hearsay from the reports and Dr. Miller's statements were testimonial within the meaning of *Crawford*, any confrontation clause error was harmless beyond a reasonable doubt. (*Nadey*, *supra*, 16 Cal.5th at p. 164, citing *Chapman v. California* (1967) 386 U.S. 18, 24.) While Dr. Miller did not offer his own opinion as to cause of death for Bell or Jones, his testimony based solely on the photographs related and described Bell's and Jones's gunshot wounds. Dr. Miller testified Jones suffered multiple gunshot wounds, including a "large defect" to the head, from a high velocity round which he opined could have been caused by a 7.62 caliber cartridge. Dr. Miller further testified Bell suffered a gunshot wound that entered her body through her right arm and exited her body through her left mid-to upper-back. We reject Rand's unsupported assertion that the jury would not expect such a gunshot wound to be fatal. The jury thus had ample admissible evidence of the gunshot wounds and to establish causes of death.

Moreover, the defense never suggested the causes of death of either Bell or Jones was anything other than the gunshot wounds they suffered. The state of Bell's and Jones's bodies and the way they died was not disputed at trial. For example, eyewitness testimony that Bell was shot, fell to the ground, and died was uncontroverted. The defense, instead, argued Rand was not the shooter. Given Rand's theory of the case and independently admissible evidence on causes of death, any error in admitting the autopsy reports and testimony about Dr. Whiteman's and Dr. Su's conclusions about cause of death was harmless beyond a reasonable doubt. (See *Nadey*, *supra*, 16

27

Cal.5th at p. 164.) The contents of the reports, and Dr. Miller's testimony concerning them, "had no effect on the jury's ultimate determination of [Rand's] guilt." (*People v. Perez* (2018) 4 Cal.5th 421, 457.) We thus conclude Rand was not prejudiced by the introduction of the autopsy reports or Dr. Miller's testimony about their contents.

## C. Substantial Evidence Supported Rand's Convictions

Rand contends there was insufficient evidence to support the first degree murder convictions of Jones (count 1), Silver (count 3), and Bell (count 4). We disagree.

First degree murder is the "willful, deliberate, and premeditated" killing of another human being with malice aforethought. (§§ 187, subd. (a), 189, subd. (a).) "'A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but "[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation."'" (*People v. Burney* (2009) 47 Cal.4th 203, 235.)

We review challenges to the sufficiency of the evidence for substantial evidence. (*People v. Tafoya* (2025) 109 Cal.App.5th 868, 892.) "[W]e review the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt." (*Ibid.*) "'"Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence."'" (*People v. Navarro* (2021)

28

12 Cal.5th 285, 339.) "'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.) Further, we do not reweigh evidence or reevaluate a witness's credibility. (*Ibid.*)

Motive in gang shootings can be reasonably inferred from the hatred felt for rival gang members. (*People v. Sanchez* (2001) 26 Cal.4th 834, 849; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001–1002.) Here, the evidence showed Rand was a member of the Main Street Crips, whose rivals were the Family Swan Bloods. Rand had a tattoo on his arm demonstrating his disdain for the rival gang. It read, "'If it flies, it dies,'" expressing a desire to kill rival Family Swan Bloods. Jones and Hall were members of the Family Swan Bloods, and Bell was affiliated with the gang.

Social media evidence was probative of Rand's involvement in the murders. The evidence supported a finding that Rand owned the Hoochie_Killa_Sway account and posted messages linked to the murders. The account exhibited disrespect for Family Swan Bloods, called for their murder, and contained threats to shoot them with a rifle. Moreover, as we will discuss further, postings claimed responsibility for the killings. There was also evidence Rand possessed and had access to assault rifles that fired the type of ammunition used in the murders, 7.62 caliber cartridges.

Additional evidence in the record supports Rand's conviction for each of the murders. As to Jones, five days before

29

he was murdered on August 18, 2015, Rand texted Dailey and asked her to buy him 7.62 caliber cartridge ammunition. Twenty-four 7.62 caliber cartridge cases were found at the crime scene, and Jones's gunshot wounds were consistent with 7.62 caliber cartridges. About a week after the murder, Rand's Hoochie_Killa_Sway account bragged about killing Jones and posted details consistent with the crime scene and murder, including accurately stating Jones was shot in the head and legs.

Silver and Bell were murdered on January 23, 2016, at a known hangout of the Family Swan Bloods, Three Star Liquor. The evidence showed that Gardner, a Main Street Crips member known as Little JM who was close with Rand, was driving a gray Jeep Patriot on the day of the shooting. The Jeep was captured on video at the scene of the shooting when it occurred. Phone records showed calls between Rand's and Gardner's phones about an hour and a half before the shooting. Google location history data showed Gardner's and Rand's devices traveling from Rand's residence on Kornblum Avenue to Three Star Liquor at the time of the shooting. 7.62 caliber cartridges were again recovered at the crime scene.

Posts on Rand's Hoochie_Killa_Sway account bragged about and took credit for the Silver and Bell murders. One post, for example, detailed that the shooter got out of the vehicle, shot Bell, shot and "stood over" Silver, and that Hall ran inside the liquor store. These details were consistent with surveillance video of the shooting. The post also mentioned being responsible for shooting Jones with a rifle and for shooting Mazique at the same liquor store. There was also messaging after the January 2016 shooting between the Hoochie_Killa_Sway account and Walker's account with Hoochie_Killa_Sway again claiming

"choppa boy" had successfully shot up Walker's neighborhood with a rifle.

In sum, there was substantial evidence supporting the first degree murder convictions. The evidence and the manner of each killing also indicates planning and deliberate intent to seek out and kill rival gang members.

Rand points out that the jury did not find the firearm allegations true in connection with the January 23, 2016, liquor store shooting of Silver and Bell. However, the jury found Rand guilty of being a felon in possession of a firearm on January 23, 2016. The prosecution's gang expert explained that possession of a firearm was critical in committing a crime such as going into rival gang territory and targeting rival gang members. This is sufficient to support Rand's conviction for first degree murder. (See *People v. Thompson* (2010) 49 Cal.4th 79, 115, 118 [evidence defendant planned to murder victim, and provided the gun used in the murder, supported first degree murder conviction].) Rand further points to evidence that other Main Street Crips said they had access to his phone and used it, but the jury was free to disbelieve this testimony and conclude the witnesses were not credible.

**D.   The Trial Court Did Not Err in Excluding Alleged Third Party Culpability Evidence**

Rand contends the trial court erred in excluding evidence of third party culpability: Dailey's testimony that her cousin, Murray, admitted to being involved in the Three Star Liquor shooting on January 23, 2016, and that evidence recovered from Murray's residence revealed black articles of clothing. We

31

conclude the trial court did not abuse its discretion in denying Rand's request to introduce the evidence.

### 1. *Additional Background*

The defense filed a pretrial motion in limine seeking to introduce evidence linking Murray to the January 2016 shooting. Rand asserted that a day or two after the shooting, Dailey saw Murray at her grandmother's house, and he was acting erratically and made comments about being involved in the shooting. Murray was then killed two days after the liquor store shooting allegedly in retaliation for his involvement. Shortly after Murray was killed, police executed a search of his home and found ammunition, memorial posters depicting Silver that were taken from outside the liquor store, and a black beanie and ski mask. The prosecutor opposed the motion.

The trial court held a hearing on the motion at which Dailey testified. She said Murray was involved in the Main Street Crips. Murray's gang nickname was "Baby Bo" or "Baby Debo," and Dailey knew a different Main Street Crips member who went by "Debo." She said that Debo was killed in August 2015 and Murray began acting out after his death.

Dailey was familiar with the shooting at Three Star Liquor in January 2016. According to Dailey, she saw Murray the day after the shooting and he seemed "worried or scared." She claimed Murray said "something about he had did what happened" and he "had been involved in a shooting at the liquor store." When asked by the trial court to state as clearly as she could what Murray said about his involvement in the shooting, Dailey replied, "He said that he did something on Avalon at this store."

32

The trial court did not allow the defense to present the evidence.  First, the court did not find the alleged statement by Murray admissible as a declaration against interest because it was "drenched in vagueness and ha[d] no indicia of reliability." Second, the court stated it did not meet the requirements for third-party culpability.  The court found there was no independent evidence linking Murray to the murders and the statement did not "eliminate defendant Rand as the shooter." Lastly, the court found the probative value of the evidence was substantially outweighed by the possibility of confusing and misleading the jury.

2.    *Legal Standard*

To be admissible, "third party evidence 'need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.'"  (*People v. Dworak* (2021) 11 Cal.5th 881, 895 (*Dworak*).)  "At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability."  (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).)  "[I]n general, 'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt:  there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.'" (*Dworak*, at p. 895.)  "[A]lthough a defendant should not be required to establish the guilt of a third person 'with that degree of certainty requisite to sustain a conviction of the latter,' exculpatory evidence pointing to that person should not be

33

admitted if it 'simply affords a possible ground of possible suspicion.'" (*Hall*, at p. 832.)

In assessing an offer of proof relating to third party culpability evidence, the court "must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325 (*Bradford*).) The trial court's decision to exclude evidence is reviewed for abuse of discretion. (*Dworak, supra*, 11 Cal.5th at p. 895.)

### 3. *Analysis*

Assuming Murray's statement was not inadmissible hearsay, we conclude the trial court did not abuse its discretion in excluding the evidence. Murray's alleged statement that he did "something" at the liquor store did not link him to the actual perpetration of the shooting, and there was insufficient independent evidence placing Murray at the scene of the liquor store at the time of the murders. Any link between the items found in Murray's residence after he was killed and the shooting rested on speculation. Rand does not argue that the items were the same items identified in the shooting. He does not cite any evidence linking the items to the shooting.

Third-party culpability evidence is not admissible where it shows only that another possesses the motive or opportunity to commit the crimes. (*Dworak, supra*, 11 Cal.5th at p. 895.) The jury would have been required to speculate about Murray's role in the shooting. More importantly, the evidence did not preclude the jury from finding Rand was the actual perpetrator. (*People v. Brady* (2010) 50 Cal.4th 547, 559, fn. 5 [evidence not material to

34

defendant's culpability because it did not create "a lingering doubt by suggesting someone other than defendant was responsible for the murder"].) The prosecution's theory of the shooting did not exclude the possibility that other participants assisted in some capacity. Consequently, the evidence was insufficient to raise a reasonable doubt of Rand's guilt for the murders.

Additionally, the trial court reasonably concluded that the probative value of the evidence was substantially outweighed by the risk that it would cause undue delay, prejudice, or confusion. (See *People v. Turner* (2020) 10 Cal.5th 786, 817 ["[w]e have repeatedly upheld the exclusion of third party culpability evidence when the third party's link to a crime is tenuous or speculative"]; *People v. Lewis* (2001) 26 Cal.4th 334, 373 ["evidence is irrelevant if it produces only speculative inferences"].)

In any event, any error in excluding the evidence was harmless. It was not reasonably probable that the verdict would have been more favorable to the defense had the trial court admitted the evidence concerning Murray. (*Bradford*, *supra*, 15 Cal.4th at p. 1325, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) Because the evidence showed more than one person was involved in the January 2016 Three Star Liquor shooting, Murray's alleged involvement would not undermine the significant evidence linking Rand to the crime scene and shooting. (See *Hall*, *supra*, 41 Cal.3d at p. 835.) For the same reasons, we reject Rand's contention that the exclusion of the evidence deprived him of his right to present a defense or due process. (*Dworak*, *supra*, 11 Cal.5th at p. 896; *People v. Gonzales* (2012) 54 Cal.4th 1234, 1261 ["the exclusion of weak and

speculative evidence of third party culpability does not infringe on a defendant's constitutional rights"].)

## E. The Trial Court Did Not Err by Excluding Evidence of a Witness's Alleged Prior Inconsistent Description of a Shooter

Rand contends the trial court violated his Sixth Amendment right to present a defense. According to Rand, the court improperly excluded evidence that the person who attempted to shoot Walker on September 20, 2015, did not look like him. We disagree.

### 1. *Additional Background*

A police report concerning the attempted shooting of Walker on September 20, 2015, described the suspect as having braids. Rand asserts that a percipient witness to the shooting, Cardenas, therefore must have told Officer Avila or Gundell that the shooter had braids. Rand denied that he ever had braids. During cross-examination, Cardenas stated he did not tell the officers that the shooter had braids because he "never saw that person." When questioned by the defense, Officer Avila testified he did not recall Cardenas describing the shooter as having braids. Officer Avila said he conveyed the information Cardenas gave him to Officer Gundell so that he could put it in a police report. Officer Gundell testified he briefly spoke with Cardenas but did not recall the conversation and did not recall Cardenas giving any description of the shooter.

The trial court held a sidebar after the prosecutor objected to defense counsel asking Officer Gundell whether he wrote a report after speaking with Officer Avila. After the court stated it

36

had a "problem" with the testimony because counsel was inferring the description in the report came from Cardenas, the defense concluded its questioning but requested to keep Officer Gundell on call.

The following day, defense counsel argued the evidence was admissible under Evidence Code section 1237 as a past recollection recorded. The defense pointed out that Detective Romero testified that Cardenas told the detective in June 2017, as part of Detective Romero's investigation of the Jones murder, that the shooter in the September 2015 incident appeared to have braids, though Cardenas was not sure. The prosecutor, however, asserted the description in the police report the defense was relying on was unattributed to any declarant.

The trial court determined defense counsel did not satisfy Evidence Code section 1237's elements. The court reviewed the police report and said that "the People are completely 100 percent correct that that particular description of the suspect is not attributed to anybody. . . It says nowhere in the police report that 'we got this description from Mr. Cardenas.'"

2.    *Analysis*

In arguing that the trial court's ruling violated his right to present a defense, Rand relies on *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*) and *Green v. Georgia* (1979) 442 U.S. 95 (*Green*). *Chambers* and *Green* are distinguishable.

In *Chambers*, the defendant was charged with murder. The defendant sought to introduce the testimony of three different people that, shortly after the crime, another man named McDonald confessed to committing the murder. McDonald also wrote a sworn confession. (*Chambers*, *supra*, 410 U.S. at

37

pp. 287–289.)  After McDonald repudiated the sworn confession, the trial court refused to allow the defendant to treat McDonald as an adverse witness because Mississippi law prohibited impeaching one's own witness.  (*Id.* at pp. 291, 295.)  The trial court also rejected on hearsay grounds the defendant's attempt to introduce the testimony of the three witnesses to whom McDonald had admitted committing the murder.  (*Id.* at pp. 292–293.)  The Supreme Court reversed the conviction, finding the defendant was deprived of a fair trial.  (*Id.* at p. 302.)  The Court found the statements at issue were made "under circumstances that provided considerable assurance of their reliability" and were "well within the basic rationale of the exception for declarations against interest."  (*Id.* at pp. 300, 302.)  "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."  (*Id.* at p. 302.)

In *Green*, the Supreme Court determined the exclusion of hearsay evidence under circumstances similar to *Chambers* violated the defendant's right to a fair trial on the issue of punishment.  At the penalty phase of trial, the court excluded a third-party account of a confession from a co-defendant, because the court found the evidence constituted hearsay.  (*Green, supra*, 442 U.S. at p. 96.)  *Green* held, "Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment."  (*Id.* at 97.)  "The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, [citations] and substantial reasons existed to assume its reliability."  (*Ibid.*)

*Chambers* and *Green* involved spontaneous statements against the speaker's penal interest, which "[are] inherently reliable." (*People v. Dixon* (2007) 153 Cal.App.4th 985, 999.) The unattributed description in the police report in this case does not bear the same indicia of reliability. There is no showing, for example, that Cardenas's alleged description of the shooter in the police report was made against Cardenas's penal interest. Further, the record shows Officers Avila and Gundell spoke to multiple people after responding to the scene of the shooting, including Walker, his cousin, Cardenas, and the person who provided the video of the shooting. The description in the report was not attributed to any specific declarant, so it is unclear whether Cardenas provided the description.

*Chambers* and *Green* "require substantial indications of reliability," and "'[t]he same lack of reliability that makes . . . statements excludable under state law makes them excludable under the federal Constitution.'" (*People v. Butler* (2009) 46 Cal.4th 847, 866–867.) Further, "*Chambers* specifically confined its holding to the 'facts and circumstances' presented in that case; . . . the ruling did not 'signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures.'" (*United States v. Scheffer* (1998) 523 U.S. 303, 316; see also *Green, supra*, 442 U.S. at p. 97 ["In these *unique* circumstances, 'the hearsay rule may not be applied mechanistically to defeat the ends of justice'" (italics added)].) "Application of 'the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a

39

defense."'[7]  (*People v. Westerfield* (2019) 6 Cal.5th 632, 705.) Therefore, the trial court's ruling was not constitutional error.

We note evidence that the person who attempted to shoot Walker in September 2015 appeared to have braids was admitted at trial.  During cross-examination, Detective Romero testified that Cardenas told her in 2017 that he thought the September 2015 shooter appeared to have braids, though he was unsure.  The jury thus had the opportunity to consider the possibility that Cardenas described the shooter as having braids.  Rand fails to establish that the trial court's exclusion of similar testimony from Officer Gundell constituted prejudicial error.

## F.     The Trial Court Erred in Failing to Dismiss the Gang Special Circumstance

At sentencing, the trial court dismissed the section 186.22 gang enhancement because "the People did not prove the gang allegation under the new statutory requirements of AB[ ]333, in which they have to show that the benefit to the gang is more than reputational . . . ."  The court declined the defense's request to dismiss the section 190.2 gang special circumstance.  Rand contends the court erred by failing to dismiss the gang special circumstance after dismissing the gang enhancement.  The People concede the evidence was insufficient to sustain the section 190.2 special circumstance.  We agree.

Section 190.2, subdivision (a)(22) provides, "The penalty for a defendant who is found guilty of murder in the first degree is

---

[7]     Rand does not make any showing with citation to authority and reasoned argument that the trial court erred in finding the evidence did not satisfy the requirements for admission as a prior inconsistent statement under Evidence Code section 1237.

death or imprisonment in the state prison for life without the possibility of parole if [¶] . . . [¶] The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." Proof of the existence of a criminal street gang as defined in section 186.22, subdivision (f) is a prerequisite to proving the gang-murder special circumstance. (*People v. Rojas* (2023) 15 Cal.5th 561, 565 (*Rojas*); *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 823.)

Prior to Rand's trial, the Legislature enacted Assembly Bill 333, which made multiple changes to section 186.22. (*Rojas*, *supra*, 15 Cal.5th at pp. 566–567.) The changes, "as incorporated into the gang-murder special circumstance, retroactively apply to cases that are not yet final." (*In re A.M.* (2024) 102 Cal.App.5th 557, 569.) Following Assembly Bill 333, section 186.22, subdivision (f) defines a "'criminal street gang'" as "an ongoing, organized association or group of three or more persons . . . having as one of its primary activities the commission of one or more of the criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." Subdivision (e) of section 186.22 defines "'pattern of criminal gang activity'" as committing offenses that benefit a gang in a way that is "more than reputational."

The prosecution's gang expert did not testify the murders Rand committed benefited his gang in any way that was more than reputational. The evidence was thus insufficient under the law as amended after trial by Assembly Bill 333 to sustain the special circumstance finding under section 190.2. (*Rojas*, *supra*,

41

15 Cal.5th at p. 580; *In re A.M.*, *supra*, 102 Cal.App.5th at p. 570.)  Accordingly, we reverse the gang special circumstance findings and remand for retrial of the allegations at the option of the prosecution.  (*People v. Hin* (2025) 17 Cal.5th 401, 464 ["retrial is permitted where the appellate court finds only that the evidence was insufficient under the law as amended posttrial by Assembly Bill 333"].)

## DISPOSITION

We reverse the true findings on the section 190.2, subdivision (a)(22) gang special circumstance.  On remand, the prosecution shall have the option to retry Rand on the gang special circumstance.  If the prosecution declines to do so, the trial court shall resentence Rand accordingly.  The judgment of conviction is affirmed in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MORI, J.

We concur:


ZUKIN, P. J.


TAMZARIAN, J.